McDuffie v. Bosevich Okay, Mr. Delaney. May it please the court. Good morning, your honor. I represent Angus McDuffie, Steve Ravsky, and several other shareholders in a small, privately held, franchised accounting services business called Small Biz Pros. The sole issue in this appeal is whether six shareholders in the company reached an agreement enforceable under Georgia law regarding their ownership interests in Small Biz Pros. We submit that they did. Let me ask you a question. If the Holt Co. agreement did not establish a firm 40-20-40 voting scheme that limited members of the old Paget shareholder class from ever acquiring more voting power by directly investing in Paget, do we have to affirm? If it did not establish the 40-20-40, then I think you would affirm. But of course, your honor, we submit that it did establish the 40-20-40. And let me clarify for your honor's benefit, there is a question that could come up. Well, what if somebody acquired shares from the new shareholder, the new investor block? Are, is the burdened shareholders, the Saunters and the Austins, are they required to not vote those shares? What happened between the parties in this case, your honor, was the burden that was established by the 2003 agreements, the 40-20-40, and the reallocation of voting to the new investors to get them up to 40, that was fixed in time at the moment it was adopted. What I'm having a problem is, I'm having a problem determining where in the Holt Co. agreement there's a restriction on the Saunters and Austins acquiring a greater voting share by purchasing some of the shares from the new investors. Well, your honor, ultimately, they could acquire enough to get, to have their block get higher. And that's what actually happened here, your honor. The Saunters, and actually my client, Mr. Rasky, somewhere along the line, after the 2003 agreements, did acquire more shares from the new investor block. Your point at least now, your point at least now is, they can acquire all they want, but by agreement, they're limited to the 40 percent as a voting share. Actually, your honor, let me, it's, we're not taking a position that's that extreme. It's actually less extreme than that. It's the shares that they owned at the time the 2003 agreements went into force. Those are on voting. And if they acquired enough new shares. Can I talk about something more fundamental? Yes, your honor. I want to look at the agreement itself. I'm looking at the one that's attached to the complaint, but I know it's a few different places in the record. Which agreement? The, I'm sorry, the Holt Co. agreement. So it's at document 1.2, page 1 and 2. Yes, your honor. Quote, in any event, the voting trust agreement will terminate in the expiration of the fifth year from the date of this agreement, at which the Padgett shareholders and Surge shareholders will vote their shares in Holt Co. USA and Holt Co. Canada in such a manner that the Padgett shareholders will control 40 percent of the stock. The Surge shareholders will control and vote 20 percent of their stock. And then there's the remaining 40 percent to the extent that it's been issued to new investors. Right? Yes, your honor. There's no Holt Co. and no Canada, right? There, actually, there was a Holt Co. Canada, but there's none. No one holds stock in that right now. That's, it's not an issue in this case. How is this at all applicable to anything? Because, your honor, in the, in the April 2003 agreement, at the end of paragraph 1, the parties all recognize that our arrangements, meaning the arrangements for the company we do now hold stock in, are governed by the Holt Co. agreement. There are a lot of things in the Holt Co. agreement, I can go through them with you, that absolutely still apply. For example, there's provisions that, that Mr., that Mr. Ravsky will make best efforts to get new investors, that those new investors will get 40 percent. It talks about who gets employment agreements. Those arrangements are still valid. The Holt Co. agreement still has lots of provisions that are there, but paragraph 3 would seem to be completely inapplicable. Well, your honor, what is applicable is the structure of the, of the voting, okay? The, how we got to where it says that. Yeah, I, I know you wanted to say that, and I get that's your position, but I don't see how you could say one paragraph which dictates holding in two companies that no longer exist or are inapplicable somehow governs and transfers to something else, because another agreement references that this arrangement is still there, even though that same agreement you just quoted for says those, these things are inapplicable, Holt Co., Canada and Holt Co., USA. Your honor, what we have to do is read the agreements together, because. Clearly, but when it says that, there are provisions in there that, where the arrangements are still there. The arrangement that Mr. Ravsky will be CEO. Yeah. That he will use his best efforts to get new investors. Those arrangements are still there, and in fact, the 2003 letter agreement is specific about what happens to those 40 percent if it goes over or under and where those shares are distributed. So it seems to work all together fine. It does, and then the question is the fundamental control of the company that was intended to be established by the Holt Co. agreement, when that gets adopted into the operating company with the 2003 agreements, how does it work? Well, it seems to be in paragraph one of the 2003 agreement, and now I'm looking at docket entry 1.3. Yes, your honor. On paragraph one, it says that the entity was anticipated to create a voting block, what you're talking about, which gave me voting control for five years and other voting restrictions. It has been decided that a voting restriction be placed on the stock certificate of Padgett shareholders prior to then. Therefore, all shareholders would be issued shares there. In other words, what it says is this company is no longer existing. This was the anticipation of what's going to happen, and instead, we have decided to do different than that. Yes, and then what are we talking about? What we're talking about, your honor, is how you read them together. The provisions that you referenced in the original Holt Co. agreement in 2003, excuse me, in paragraph three of the Holt Co. agreement from 2000, provide that the Steger shareholders will control and vote 20 percent of the shares of a company that doesn't exist anymore. Right, your honor, but just like, as your honor points out, there are lots of provisions that are all about a company that doesn't exist. No. That everyone recognizes are being adopted. Let me be clear. There are provisions that have nothing to do with Holt Co. I'll give you an example. Paragraph five, the Padgett shareholders, which that exists, acknowledge that 40 percent of the shares of Padgett USA and Padgett Canada, which are different, and those become small biz bro, will be available to surge in order to allow surge to issue those shares to investors. And then that fits neatly within the 2003 agreement, which then says that if there happen to be some leftover shares, here's how they get distributed in the small biz pro framework. It seems to be that they'd work together fine, but that there are some things that are not applicable because they changed how they were going to structure this, which is understandable. Well, yes, your honor, but the problem that we have is that the concept of the old owners controlling and voting 40 percent of the shares and the Ravskys controlling and voting 20 percent of the shares and then the new investors up before, that was never going to work under the Holt Co. agreement because the parties realized that if you put 40 percent in the operating company directly owned by the new investors, but then you have the other 60 percent in Holt Co., which is divided two-thirds, one-third, okay, the old investors wind up controlling the entire company because they've got two-thirds of Holt Co., which controls 60 percent of the operating company, which puts them in complete control and is the exact opposite of the 40-20-40 allocation that the parties were trying to achieve. So what we have to do is look at how do we accomplish the intent of the parties to have 40-20-40 as it becomes applied to the operating company. Except that there's no indication anywhere in the 2003 agreement that they wanted to take that intent, as you say, and replace Holt Co. with the small biz pro shares. There's not. I mean, all you point to is the language that says, hence, our arrangements are now governed by the Holt Co. agreement and this agreement. Not the Holt Co. agreement is operative in all form and effect. Not we are replacing this company with that company, but the arrangements are the same. But there is, your honor, and let me direct your honor's attention to paragraph three in the April 2003 agreement. The Holt Co. agreement continues in full force and effect. What that means is that all of it... Whoa. We agree that the third to have any effect on the validity which continues to have full force and effect. There's no doubt that the original agreement has force and effect, but there's no... If there was Holt... Let me be clear. If there was Holt Co. Canada and Holt Co. USA, we wouldn't be here. Paragraph three would be clear. It would be as you suggest. But once those companies are gone, that paragraph has no application. But the parties agreed here that when they're adopting it into the governance of the that doesn't apply. We recognize this doesn't apply. Where does it say they're adopting the Holt agreement? That's... It's a combination, your honor, of the last clause of paragraph one of the April 2003 agreement. It says our arrangements are now governed by this agreement. Not we are adopting wholesale the prior agreement and incorporating it into this new agreement. And that's what that meant, your honor, that we're adopting it. And we, your honor, we have... If there's any... Arrangements means we are adopting wholesale provisions that for companies that don't longer exist? Yes, your honor. When you combine it with paragraph three... But what about the rest of paragraph one in the 2003 agreement? It says there we anticipated these voting blocks, the ones you're referring to, to give me control. But we've now decided, it has been decided with my lawyer, that a voting restriction be placed on the certificates instead. They're replacing the exact thing that you're talking about. And the question then becomes how do we apply it to the new company? How do we apply it to the to the operating company when we're adopting these governance provisions in? Well, it'd have to be on the stock restrictions. It'd have to be on the back of the stock certificate. Well, that's one way to do it. And the other way to do it... No, that's the way that the parties agreed to do it. Well, they also agreed to have this voting allocation come effect for the new company, your honor, for the operating company, your honor. In my last few seconds, your honor, we asked the court to reverse and enforce with with instructions to enforce the voting agreements that the parties reached here to the extent there's any ambiguity. And I understand, your honor, if it were written better, we wouldn't be here. But it is there. And the RASCI affidavit provides the parole evidence that explains any ambiguity that is in the agreements, your honors. Thank you. Okay, Mr. Delaney, you've saved three minutes for rebuttal. Mr. Mano. Good morning. May it please the court. My name is Roy Mano. I'm from Athens, Georgia, and I represent the appellees in this matter. The issue before this court is whether my clients, who are indisputably the majority owners of the Georgia corporation known as Small Biz Pros, control the company. My clients collectively own a little over 51 percent of the stock. And together with non-party Roger Harris, we own and control over 55 percent of the stock of this corporation. Now, conversely, the appellants only own 42 percent of the stock. There's a few stocks that's owned by some non-involved shareholders, but very minor amounts. And the analysis begins with OCGA section 14-2-721, which provides that a shareholder gets one vote for each share of stock that they own. And that one vote per share is enshrined in our corporation in Article 2, Section 6B. Do we need to get there if paragraph three doesn't govern? In other words, if we re-paragraph three as only applying to Holdco and Holdco Canada, and the 2003 letter agreement says that those companies are no longer being created, then do we need to get to the statutory argument that you've made? No, no, Your Honor, we don't. And I agree. That was one of the arguments we made below to Judge Lamb, was that as a threshold matter, deciding that the Holdco agreement, which applied to a different company that was never formed and doesn't even exist anymore, is inapplicable to this situation. And to apply the type of— It's been superseded by the 2003 agreement, right? Yes, sir. Yes, sir. And to the extent that they claim that the 2003 letters somehow impose on all stockholders these 40, 20, 40 voting blocks, in order to do so and move away from the one vote per share, they had to have complied with OCGA Section 142732, which permits a corporation to deviate from the one vote per share. But to do so, all shareholders have to sign it. And that's been the biggest flaw with the appellant's argument from the get-go, is that these 2003 letters, admittedly, don't include all the stockholders of the corporation. You can't impose 40, 20, 40 blocks on people who've never signed off on this thing. And that was the argument below. So, yes, to answer your question, Justice, look, yes, you don't get there. You don't need to get there if you decide that the Holdco agreement was inapplicable because it clearly applies to corporations that are not active anymore. At least that provision of it. I mean, there are other things that do apply. I mean, for example, Paragraph 6 discusses how Saltner and Austin are giving their financial statements and that those comply with GAAP. If for some reason it was determined later on that those were fraudulent or didn't comply with GAAP principles, that would clearly be enforceable, independent of whether Holdco existed or not. I agree with that, Your Honor. And, of course, that was all done. That's not what the appellants are asserting now. I would also point out to the Court, and Justice, your question to Mr. Laney was on point. Didn't you decide to handle whatever restrictions you wanted to be carried forward into Small Biz Pro by putting it on the stock restrictions? I would point out the 2003 letter agreements talk about a voting trust which was never formed. And the 2003 letter also talks about— But the voting trust was only supposed to be for five years anyway. Correct. And it was still never done. Right. And the voting restrictions that you asked Mr. Laney about were never done. But yet they come here today and they ask this Court to enforce and depress, not just depress our voting rights to 40 percent. In order to have the majority they claim, they not only have to depress our voting rights to 40 They have to strip away over 29,000 of our votes and use it themselves to obtain a majority. That's the problem with the appellant's argument. Now, the analysis, and I would consent that the analysis should end right there. But they don't have a document signed by all the shareholders that set 40-20-40 blocks and allow them to strip away over 29,000 of our votes and let them use it. They've alleged that it works like a proxy. It doesn't work like a proxy. First of all, under state law, a proxy is only good for 11 months. So if it was a proxy, it expired a long time ago. Now, if the only way they can try to make this fit is by trying to say these are pooling agreements, and which are allowed under OCGA 14-731. But pooling agreements just allow for the manner in which the stock will be voted. In other words, we'll vote our stock in the same manner. I could sign an agreement with you, Justice Luck, that says we'll agree to vote our shares together, whether that's for something or against something, and we'll agree to abstain on certain issues. But that's what a pooling agreement is for. And what they purport with this 40-20-40 block is not a pooling agreement. They're not saying that my clients and Mr. Raskin will agree to vote their shares together on certain matters. They're talking about stripping away, decoupling the weight of the vote and reallocating it. And they have to reallocate it every single time a share changes hands, particularly across a block. That is, obviously, when you change the weight of the votes. That's deviating from the one vote per share rule. And to be valid and to be effective, it either has to be set up that way from the get-go in the Articles of Incorporation, or every shareholder has to sign up for it. And they don't have either one. They admittedly don't have either one. The district court's analysis, Judge Land analysis, looked at that issue, but then just looked at the documents and just used garden variety, good old-fashioned George contract law, and said, these documents are not ambiguous. They just don't do what the appellants claim they do. And they don't. And so just applying... Just reading the documents. Just reading the documents, Judge Land said, and he's correct, they don't do what the appellants don't. They don't carry forward any type of 40-20-40 block. They don't say that my clients agreed to depress their votes to 40%. Regardless of how much shares they have. They don't say that the new shareholders get to vote our shares by some proportion that's going to be stripped away and sprinkled across everybody in the new shareholder block. And we also pointed out in our briefs, not just the potential, how it almost came to be, that the new shareholders had, when Mr. McDuffie was issued 38,000 shares, would have been overweighted if just an option had been used by one of the other shareholders. And despite what they're saying in their reply brief, they have maintained all along that if the new shareholder block would have been overweighted, they would have stripped votes away from them as well. I would point the court to Mr. Rasky's affidavit that's in the record at ECF Document 97, Paragraph 8. Counsel, you really don't want us to look at that. In other words, the only way we're looking at the affidavit is if we find that there's some ambiguity that requires us to look at parole evidence. Correct. Correct, Your Honor. I don't think there's any reason for this court to have to go there. I think that, Justice Luck, I think your question was spot on at the outset. If the whole code doesn't bring forth the 40-20-40 vote, isn't that the end of the analysis? It doesn't, and that is the end of the analysis. I would agree with that. And I think Judge Land's analysis in construing just garden variety Georgia contract law was also spot on and wasn't even attacked or criticized by the appellants in their brief. The issue is very simple. My clients own 55% of this corporation, and they should be able to use their votes to run their company, the company they own, a substantial majority in any way they want. And this court should allow the majority owners of this company to do so and affirm Judge Land's position. I don't have anything else, Your Honor. If you have any questions for me, I'll be glad to answer them. I don't hear any, so thank you very much. Thank you, Your Honor. Mr. Delaney, you've saved some time for rebuttal. Thank you, Your Honors. Standing here in 2022, I must allow that had the 2003 agreements been better lawyered, using more words perhaps, and maybe giving some examples and foreseeing all kinds of future developments of what if somebody buys more shares, what happens then? How do we reallocate? And if it had all been reconfirmed in a single better writing, and if some of the other things that Your Honors have asked about had been done, we wouldn't be here. But we are here today now. The Sautners, the Austins, and the Raffkes, the parties who signed these agreements back in 2003, were not lawyers. And whatever advice they were getting at the time is not in the record in this case. However good or bad that advice was back in the day, the unmistakable and undisputed fact is that all three couples intended to be bound, and specifically that the old owners of small biz pros would control and vote 40 percent of the shares and so forth to establish the 40-20-40 balance. Your Honors, the words and the parties' intentions appear in the 2003 agreements and the whole co-agreement that they reaffirmed as applying to the operating company. And to the extent that there may be any ambiguity, and that's what Judge Land's holding was, so ambiguous that nothing is there for the court to enforce when it comes to a voting agreement. Mr. Raffke's affidavit explains it all. And Your Honor, Judge Locke, that goes to your question. They don't want you to look at that affidavit, which does explain it all. Your Honor, there is no departure from one share, one vote. There is no creation of voting blocks. The only parties burdened by the restrictions on voting and the reallocation of votes are the parties who signed those 2003 agreements. And Your Honors, that's why we ask you to enforce them. Thank you. Thank you. Thank you, Mr. Delaney. We have your case and we'll be in recess until tomorrow. Thank you.